**Patrick E. Mahoney**, ISB #5242
**MAHONEY LAW, PLLC**
CAPITOL GATEWAY PLAZA
1211 W. Myrtle Street, Suite 350
Boise, Idaho 83702
Telephone:  (208) 345-6364
Facsimile:  (208) 342-4657
patrick@patrickmahoneylaw.com

**James G. Reid**, ISB #1372
**KAUFMAN REID, PLLC**
1211 W. Myrtle St., Suite 350
Boise, Idaho 83702
Telephone: (208) 342-4591
Facsimile: (208) 342-4657
jreid@krlawboise.com

Attorneys for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GARY L. STORM and SUSAN L. STORM, husband and wife,<br><br>        Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA; and DOES I-X,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

**COMPLAINT AND DEMAND FOR JURY TRIAL** - 1

COME NOW, the above captioned Plaintiffs, by and through their counsel of record, and for their Complaint against the Defendants captioned above, state and allege as follows:

## JURISDICTION, PARTIES, AND VENUE

1. This is a case of medical negligence brought by Plaintiffs Gary L. Storm and Susan L. Storm, husband and wife. Plaintiffs reside in Boise, Idaho. At the time of the conduct alleged herein, and at all times thereafter, Plaintiff Gary L. Storm had been honorably discharged from active military service. Plaintiff went into the Boise VA medical center in July of 2015 for what should have been a routine left knee replacement surgery, but ended up an above-the-knee amputee.

2. Defendant United States of America is sued under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et. seq.*, as the representative Defendant and real party in interest for the Boise VA Medical Center of the United States Department of Veterans Affairs and those employed by it to provide healthcare services at said facility. This action involves a claim against the United States, for money damages, for personal injury caused by the negligent and/or wrongful acts or omissions by employees of the government while acting within the scope of their office or employment. Under the laws of the State of Idaho, said healthcare providers would otherwise be liable to the Plaintiffs for the medical negligence alleged herein. Federal jurisdiction is therefore proper pursuant to 28 U.S.C. §1346(b)(1). The location of the conduct alleged is the Boise VA Medical Center in Boise, Idaho,

hence venue is proper here pursuant to 28 U.S.C. 1391 and 28 U.S.C. 1402(b). The amount in controversy, exclusive of interest and costs, exceeds $75,000.

3. The individuals employed to provide healthcare services at the Boise VA Medical Center, whose conduct failed to meet the applicable standards of care as to the treatment rendered to Plaintiff Gary L. Storm, from July 9th through and including July 10th of 2015, and who are covered employees under the Federal Tort Claims Act for purposes of this case, are identified as follows, without limitation:

    a.    Nurse Suzanne Canova;

    b.    Nurse Tara Nyborg;

    c.    Brian Martin, P.A.;

    d.    Nurse Kalei Sandercock;

    e.    Dr. Robert McKie, M.D., Internist;

    f.    Carl Andrus, P.A.;

    g.    Karen Mebane, P.A.; and

    h.    Dr. William Bourland, M.D., Vascular Surgery

4. Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as Does I through X, inclusive, and therefore sue those Defendants by such fictitious names. Plaintiffs are informed and believe, and on that basis allege, that the Defendants sued herein as Does I through X are in some manner legally culpable for the injuries and damages suffered by the Plaintiffs. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

COMPLAINT AND DEMAND FOR JURY TRIAL - 3

5.    Plaintiffs timely presented this claim in writing to the appropriate United States Department of Veteran Affairs claims office. The United States Department of Veteran Affairs, by and through its Office of Chief Counsel, denied this claim as not amendable to administrative resolution as of June 29, 2016, thus this lawsuit is appropriate pursuant to 28 U.S.C. §§ 1346(b) and 2671-2680, *et seq*.

## FACTS AND GENERAL ALLEGATIONS

6.    Plaintiffs hereby incorporate and re-allege herein all previous paragraphs of this Complaint.

7.    Gary Storm, age 70, was admitted to the Boise VA Hospital for a routine left knee replacement surgery on July 8, 2015 at 0600. Mr. Storm needed a knee replacement due to bone-on-bone arthritis of the knee. His surgeon was Dr. Sean Hassinger. Continuous femoral nerve and sciatic nerve blocks were placed. The surgery appeared to go as planned and was complete by approximately 0848.

8.    Mr. Storm was then admitted to the medical-surgical post-operative care ward ("med-surg"). As of 1632, a nursing assessment was done by Nurse Suzanne Canova. However, Nurse Canova failed to chart any specifics of an assessment of the subject limb, i.e., there is no charting of assessment of limb temperature, color, pedal pulses, capillary refill time, sensation, or movement. This is a violation of the standard of nursing care.

9.    By midnight of July 9, 2015 (post-op day 1) Mr. Storm's pain was noted to have "skyrocketed," according to a note by anesthesia-CRNA. This is the first sign of compartment syndrome and an ischemic problem. By 0030 that morning,

COMPLAINT AND DEMAND FOR JURY TRIAL - 4

Mr. Storm was assessed as barely being able to move his toes. This too is a sign of developing compartment syndrome.

10. As of 0702 that morning, nursing staff charted that the patient remained in pain for most of the night after regaining some more feeling in his leg. At 0715, a nursing assessment was done by Nurse Tara Nyborg, who charted that the patient did not sleep that night, with pain of 7 to 12 of 10. The patient's pain level had increased to 10, and stayed at or near that level, i.e., mostly at a 9 or 10 of 10. Numbness to the left lower extremity was charted; and, while the right dorsalis pedis pulse was charted as strong and palpable, left dorsalis pedis pulse was charted as being weak. This was the first indication that the patient's left lower extremity pulses had changed, was a sign of compartment syndrome and ischemia, should have been reported to the patient's surgeon, and should have triggered hyper-vigilant, frequent assessments with a high index of suspicion. Failure to report the pulse situation to the physician (and physician's assistant) was a violation of the nursing standard of care by Nurse Nyborg.

11. By 1409 on the afternoon of July 9, 2015, pain was charted as being a 14/10, by 1522 at 12/10, and by 1628 pain was too severe for the CNA to clean the patient. During this day, Mr. Storm was under the care of the nurses and PA Brian Martin, both of whom failed to notify the patient's surgeon of the situation.

12. During the early-morning hours of July 10, 2015 (post-op day 2) at 0248, a nursing shift assessment was charted, with the patient's pain level of 9 of 10 reported as "acceptable", with no charting of the specifics for left leg temperature,

COMPLAINT AND DEMAND FOR JURY TRIAL - 5

sensation, color, or motor ability. The lack of such assessment is a violation of the nursing standard of care, and considering pain of 9 of 10 as acceptable, is a violation of the nursing standard of care as well.

13. PA Brian Martin did a dressing change on Mr. Storm at 0732 that morning, which was documented as taking a long time due to pain issues. While dorsalis pedis pulse was charted as being good, there was no charted comparison done as to the subject left leg; color and capillary refill were not charted; swelling level was not charted either, all in violation of the standard of care. Eight minutes later, at 0740, a nursing assessment was done by Nurse Kalei Sandercock who charted: pitting edema; left deep pedalis pulse was "obviously" weaker than right; numbness and tingling in the subject foot; patient was barely able to move his toes; pain 8/10; and tenderness with palpation to the lateral calf area. Nurse Sandercock charted that she notified PA Martin of the situation, but there is no evidence that PA Martin thereafter took any urgent action, despite the fact that these were all urgent, acute signs of progressing ischemia and compartment syndrome in this clinical context. Nurse Sandercock herself did not take further action in the face of PA Martin's inaction. This inaction by the nurse and physicians' assistant was a violation of the standard of care.

14. Mr. Storm's left foot was still warm with brisk capillary refill at that time, i.e., it was not too late for the patient at this point, but the red flags for an impending ischemic problem with compartment syndrome were now present. The situation should have been immediately reported to the patient's surgeon and

immediate compartment pressure measuring performed, an immediate vascular consult should have been requested, serial monitoring with a high index of suspicion should have begun, and transfer to St. Luke's hospital should have been requested whereat the specialists were capable of treating compartment syndrome and arterial emergencies.

15.     By 1009 on the morning of July 10, 2015, PA Martin noted that Mr. Storm was again complaining of left calf tenderness, which (belatedly at this point) prompted PA Martin to call for a vascular duplex study (Doppler ultrasound), although the study was not ordered on a STAT basis, and no further neurovascular assessments were charted, in violation of the applicable standard of care for a PA under the circumstances.  Again, the situation should have been immediately reported to the patient's surgeon and immediate compartment pressure measuring performed, an immediate vascular consult should have been requested, serial monitoring with a high index of suspicion should have begun, and transfer to St. Luke's hospital should have been requested whereat the specialists were capable of treating compartment syndrome and arterial emergencies.

16.     There is a gap in the records, during which timeframe it does not appear that an med-surg nurse or PA Martin checked on the patient for five hours, from 1009 to 1505. (In the interim, some routine interaction occurred by others. For example, Rehab Assistant Mathew Dunn saw Mr. Storm at 11:15; he charted pain in the left calf of which nursing was "aware."  CNA Angie Birkle gave the patient a comfort bath, changed his linens, and changed his pajamas at 11:57 a.m.)  A five-

COMPLAINT AND DEMAND FOR JURY TRIAL - 7

hour gap in a nursing or PA conducted patient assessment under these clinical circumstances is an egregious violation of the standard of care.

17. Given that PA Martin did not order the Doppler ultrasound study be done on a STAT basis (in violation of the standard of care), it was not completed until 1400 on July 10, 2015, four hours after PA Martin ordered it. The results were read as negative, which were interpreted to rule out deep vein thrombosis (DVT), however PA Martin did not chart that he interpreted the results to rule-in any other possible causes, i.e., most critically, compartment syndrome and arterial occlusion/compromise were not charted as having been included in the differential diagnosis. Despite being the most obvious (and worst) potential causes of Mr. Storm's presentation, neither arterial compromise nor related/associated compartment syndrome were charted as having been considered or ruled out, in violation of the applicable standard of care. There was no effort by PA Martin (who ordered the Doppler ultrasound) to make this differential diagnosis, and he failed to notify the surgeon as to the same.

18. It should be noted that Internist Robert McKie, M.D., did a late entry, five days later, countersigning the tech's reading of the Doppler ultrasound study, wherein he wrote that the study revealed "no convincing evidence for venous thrombosis." This again reflects a failure to conduct an appropriate differential diagnosis whereby a determination was made of what was causing the acutely worsening, dangerous symptoms. Moreover, and again, the situation should have been immediately reported to the patient's surgeon and immediate compartment

COMPLAINT AND DEMAND FOR JURY TRIAL - 8

pressure measuring performed, an immediate vascular consult should have been requested, serial monitoring with a high index of suspicion should have begun, and transfer to St. Luke's hospital should have been requested whereat the specialists were capable of treating compartment syndrome and arterial emergencies.

19. The records reflect that, at 1420 that day, Mr. Storm was attempting physical therapy, with a 7-of-10 pain level, despite his being unable to walk due to "possible DVT", and despite the fact that Mr. Storm was complaining of left calf pain (as to which the therapist charted that nursing was "aware"). The continued left calf pain was a red flag for compartment syndrome and an ischemic problem.

20. At 1505 there appears in the records the first entry by a qualified nurse or physician assistant since 1009. Nurse Kalei Sandercock charted that there was numbness and tingling of the left lower extremity, and that the patient could barely move his toes. As before, the situation should have been immediately reported to the patient's surgeon and immediate compartment pressure measuring performed, an immediate vascular consult should have been requested, serial monitoring with a high index of suspicion should have begun, and STAT transfer to St. Luke's hospital should have been requested whereat the specialists were capable of treating compartment syndrome and arterial emergencies.

21. At this point, the VA medical records devolve into a jumble of after-the-fact late entries, with no explanation for why proper charting could not have been done. Nurse Sandercock did a late entry, at 2015 that evening, presumably referring to 1505 that afternoon, wherein she claimed that she had attempted to

COMPLAINT AND DEMAND FOR JURY TRIAL - 9

notify PA Martin, but that he had left the hospital, so she called on-call PA Carl Andrus.  It was a violation of the standard of care for PA Martin to have simply left the hospital without first bringing PA Andrus up to speed on the patient's situation by way of a proper patient-handoff.  Nurse Sandercock's late chart entry admits that the patient was unable to move his left toes, that the left foot had become pale, and that the left foot was had become dusky in appearance, however critical time-details are not provided, evidencing a lack of proper monitoring of the patient yet tacitly acknowledging the critical nature of these findings.

22.     PA Andrus also did a late entry, at 1859, after the patient had already been emergently transferred to St. Luke's, wherein he reported that he had purportedly examined the patient (along with PA Karen Mebane and Dr. Bourland).  However, the time of this exam is not charted, nor is the time at which PA Andrus thereafter notified Dr. Hassinger (the patient's surgeon).  This is despite the fact that Nurse Sandercock claims to have notified PA Andrus at or near 1505.  PA Andrus noted that he had been informed by the patient's nurse that Mr. Storm had been complaining of calf pain and that the nurse was unable to find pedal pulses.  However, PA Andrus does not chart when this occurred or provide any sort of timeline, thereby evidencing a lack of proper monitoring of the patient.

23.     PA Andrus did yet another late chart entry, an "addendum," in the progress notes, a full six days later, wherein he stated that he did in fact finally report this situation to Dr. Hassinger who ordered "immediate" CT angiogram study of the left knee blood flow be done.  However, again, the time at which Dr.

Hassinger was notified was not charted, although it is presumably at or about 1700 since the CT angiogram was ordered on an immediate basis upon Dr. Hassinger's instructions. At 1702, the CT angiogram was done, over ten hours after the pulse issue was noticed at 0740 that morning and three hours after the pulses were completely non-palpable. This time delay reflects an egregious violation of the standard of care.

24. Not surprisingly, the CT angiogram documented that Mr. Storm did, in fact, have an occluded popliteal artery, which had been causing severe ischemia to the left lower leg and corresponding compartment syndrome. The clinical history section of the CT angiogram report states that it was done for non-palpable pedal pulses and ischemic left leg. The CT angiogram report states that there was no visible blood flow through the popliteal artery.

25. Following the CT angiogram, despite its urgent findings, Mr. Storm was not transferred to St. Luke's hospital in Boise (only 3 blocks away from the VA hospital, about a two minute drive or a five minute walk) until 1836, at which point Mr. Storm's left foot was charted as being pale, dusky, with areas of darker discoloration. Pulses were not assessable, the patient could not move the foot, the foot was sensationless, the left calf area was swollen, passive ankle motion produced severe calf pain, and the left lower extremity was tense and tender with mottling. It was now far too late for the patient; Mr. Storm was later described has having presented to St. Luke's with "severe profound ischemia" of his left lower extremity.

26. It is well known that muscles in this situation may tolerate four hours of ischemia, but by 6 hours the result is uncertain, and after eight hours the damage is irreversible and usually catastrophic for the patient. This case involves egregious delay spanning over 36 hours.

27. There is no explanation charted for why a Doppler ultrasound study was not ordered the day before, on the morning of July 9, 2015 when decreased left pulses were first noticed, or later that day as the patient's pain was not properly controlled. There is no explanation as to why the physician was not timely notified. Nor is there any charted explanation of why, the following day, July 10, 2015, the Doppler ultrasound study was not done for six-and-a-half hours (1400) after the nurse and PA were aware (at approximately 0730) of an "obvious" discrepancy in the left foot pulse.

28. There is no explanation charted for why then, despite the ongoing red flags, the surgeon was not notified for another three hours (until approximately 1700). There is no explanation charted as to why an orthopedic surgical consult was not called for far earlier in the day, why a vascular specialist consult was not called for far earlier in the day, why the compartment pressures were never measured, and why a transfer to St. Luke's was not ordered far earlier in the day. There is no explanation charted for why, after the vascular study that confirmed no blood flow was done at 1700, it then took at least another hour-and-a-half for the VA hospital to transfer the patient to St. Luke's (until approximately 1830). And, there is no

charted explanation as to why the providers failed to access the chain of command and act as patient advocates in the face of this ongoing situation.

29.     These delays, spanning roughly a 36-hour period, from the morning of July 9, 2015 to the evening of July 10, 2015, allowed the developing ischemic situation in Mr. Storm's left leg to become progressively worse, until it reached a catastrophic level and it was too late for Mr. Strom.  Mr. Storm's situation was allowed to progress to the point where he was going to lose his leg, while he was at the VA, and while he was under the care of the VA providers.  The standard of care is to properly evaluate and assess the patient, properly chart, properly communicate, properly provide notification, properly obtain timely diagnostic testing and imaging, properly recognize the red flags for an ischemic problem with possible compartment syndrome, properly measure the compartment pressures, properly obtain an orthopedic surgical consult and a vascular specialist consult, and timely transfer the patient to a nearby facility capable of promptly handling the situation.  The standard of care is to do these things, if reasonably medically possible, *before* it is too late for the patient, i.e., *before* amputation is likely.  In this case, it was entirely reasonably medically possible to properly accomplish these basic patient-safety care standards *before* Mr. Storm reached the point were it was virtually certain that he would incur amputation of his left leg.

30.     The physicians' assistants and nurses demonstrated a pattern of a lack of knowledge, a pattern of lack of attentiveness, and a pattern of delay and lack of urgency in a situation wherein it is virtually certain that a catastrophic outcome

would result.  The conduct here is therefore reckless.  And, the blatant late chart entries, done after the fact, evidence a concerning lack of attentiveness and lack of coordination in the final hours, during which time the patient finally progressed past the tipping point, where it was virtually certain he was going to lose his leg.

      31.     The St. Luke's vascular surgeon, Dr. Matteson, emergently operated on Mr. Storm that evening, the evening of July 10, 2015, performing attempted revascularization and fasciotomies.  Dr. Matteson documented that Mr. Storm's left popliteal artery had a hematoma and was thrombosed, and that the muscle of the affected area was not viable.  That night, Dr. Matteson advised Mr. Storm and his family that he had done the best he could, but that Mr. Storm was "at a high risk for limb loss" at that point, given that the muscle in all four of the leg's compartments was ischemic, with obvious swelling in the compartments consistent with compartment syndrome.  Dr. Matteson told Mr. Storm and his family that night that the situation may well be irreversible such that he could require an above the knee amputation.

      32.     On July 13, 2015, Mr. Storm was taken back to the operating room for muscle debridement and wound vacuum placement.  He was transferred to a nearby long-term acute care hospital, where he had ongoing wound care and worsening gangrene ischemia.  A week later, on July 20, 2015, above the knee amputation was performed on Mr. Storm's left leg after determination was made that the left lower extremity was nonviable and nonfunctional with little or no recovery of motor or sensory function after the initial ischemic event.  A revision amputation was

performed on July 22, 2015. Mr. Storm had gone in for a routine knee replacement, but ended up an amputee.

## MEDICAL NEGLIGENCE

33.     The Plaintiffs hereby incorporate and re-allege herein all previous paragraphs of this Complaint.

34.     The Boise VA Medical Center, its nurses, physician assistants, and physicians violated the applicable standards of care, and were thereby negligent and reckless.  The providers violated the applicable standards of care resulting in a delayed diagnosis of compartment syndrome and arterial occlusion, ultimately resulting in the amputation.  Without limitation, the providers failed to timely conduct proper testing, failed to properly assess and monitor the patient, failed to timely and properly report, failed to notify the patient's surgeon, failed to order timely testing, failed to timely call for an orthopedic surgeon consult and vascular specialist consult, failed to conduct proper diagnosis, failed to act as patient advocates, failed to use the chain of command, and failed to provide a timely referral and transfer to the private hospital and specialist for appropriate surgical intervention.

35.     Moreover, as to all of these shortcomings, the Boise VA Medical Center, through its employees, and itself as an institution, failed to have proper policies and procedures in place, failed to properly train and supervise its employees, failed to properly staff the patient's case, and negligently credentialed

its physicians, which conduct is also a violation of the applicable standards of care, is negligent, and is reckless.

36.     The medical negligence and reckless misconduct on the part of the Boise VA Medical Center and its employees in failing to meet the applicable standards of healthcare practice was a direct and proximate cause of, and a substantial factor in causing, injury and damages suffered by Plaintiffs, including, without limitation, above the knee amputation of Gary L. Storm's left leg incident to what should have been a routine knee replacement surgery.  As an older above-the-knee amputee, Mr. Storm now uses a wheelchair.  He suffers ongoing pain, and nervous system problems.  His activities of daily living are compromised and impaired.  He has incurred, and will incur, substantial medical bills, therapy bills, home care expenses, transportation expenses, and other expenses incurred incident to care and treatment, as well as pain, suffering, permanent disfigurement, loss of consortium, mental anguish, and loss of enjoyment of life, past, present, and future.  Mrs. Storm has suffered a corresponding loss of spousal consortium, loss of enjoyment of life, and mental pain and anguish.

37.     As such, Plaintiffs are entitled to an award of money damages for all allowable general and special damages, in an amount to be proven at trial.  As to all of these, the Plaintiffs seek all allowable money damages, general and special, in this case.

## DEMAND FOR ATTORNEY FEES

38. Plaintiffs hereby incorporate and re-allege herein all previous paragraphs of this Complaint.

39. As a result of the Defendants' conduct complained of herein, the Plaintiffs have been required to retain the services of legal counsel to represent their interests in this matter. Pursuant to Idaho Code §12-121, Rule 54 of the Federal Rules of Civil Procedure, and all other applicable laws, the Defendants are liable to the Plaintiffs for their reasonable attorney fees and litigation costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants as follows:

a. A monetary sum to compensate them for all allowable general damages, including, but not limited to, past, present and future physical and mental pain and suffering, anguish, emotional distress, permanent disfigurement and impairment, loss of consortium, and loss of enjoyment of life, all in an amount to be determined at trial;

b. A monetary sum to compensate them for their special damages consisting of, but not necessarily limited to, all past, present, and future medical and related expenses, physical therapy expenses, rehabilitation expenses, travel expenses, and all other life care and incidental expenses, in an amount unknown to the Plaintiffs at this time but which sum shall be more readily ascertained at the trial of this matter;

    c.    Prejudgment interest to the Plaintiffs;

    d.    Plaintiffs' reasonable attorney fees and costs incurred in the prosecution of this action, or $10,000 should this matter proceed by default; and

    e.    Such other and further relief as this Court deems just and equitable.

DATED this 7th day of July, 2016.

                MAHONEY LAW, PLLC

                By_____/S/_____

                PATRICK E. MAHONEY
                Attorney for the Plaintiffs

## DEMAND FOR JURY TRIAL

Although the Plaintiffs recognize that this is an F.T.C.A. case, out of an abundance of caution, pursuant to F.R.C.P. 38, Plaintiffs hereby demand a trial by a jury on all issues properly tried to a jury, if any, in the above-entitled matter.

DATED this 7th day of July, 2016.

                MAHONEY LAW, PLLC

                By_____/S/_____

                PATRICK E. MAHONEY
                Attorney for the Plaintiffs